**CARLY SKARBNIK MEREDITH, ESQ. (SDNY 4088526)**
**DEUTSCH ATKINS & KLEINFELDT, P.C.**
21 Main Street, Suite 352
Hackensack, New Jersey 07601
*Attorneys for Plaintiff, Beth Gorin*

### UNITED STATES DISRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BETH R. GORIN, | Civil Action |
| Plaintiff, | |
| vs. | **COMPLAINT AND JURY DEMAND** |
| TOURO UNIVERSITY, | |
| Defendant. | |

Plaintiff, Beth R. Gorin (hereinafter "Plaintiff" or "Gorin"), by way of Complaint against Defendant, Touro University (hereinafter "Defendant" or the "University"), states the following:

### NATURE OF THE CLAIMS

1. Plaintiff brings this suit seeking legal and equitable relief against Defendant for (1) violation(s) of the New York City Human Rights Law, N.Y.C. Admin. Code, § 8-107(1).*;* and (2) violations(s) of the New York State Human Rights Law, NY CLS Exec.§ 290 *et seq.*

### JURISDICTION

2. For all times relevant herein, Plaintiff was a resident of the State of New Jersey and worked for Defendant at its 50 W. 47th Street, New York, New York 10036 location.

3. The Federal District Court, Southern District of New York, has jurisdiction over this action pursuant to 28 U.S.C. §1332(a) as Plaintiff and Defendant have residences in different states and because Plaintiff seeks damages in excess of $75,000.00.

**VENUE**

4. Venue lies in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. §1391 because a substantial part of the events giving rise to the claim occurred at Defendant University located at 50 W. 47th Street, New York, New York 10036.

**PARTIES**

5. During all times relevant to this action, Plaintiff is an individual residing in New Jersey.

6. Defendant is a private university with its principal location being 50 W. 47th Street, New York, New York 10036.

7. During all times relevant herein, Defendant has been the "employer" of Plaintiff as that term is defined in the New York State Human Rights Law, NY CLS Exec § 292 (5), and the New York City Human Rights Law N.Y.C. Admin. Code §§ 8-102.

8. Defendant constitutes a "person" as that term is used in the New York State Human Rights Law, NY CLS Exec § 292 (1), and the New York City Human Rights Law N.Y.C. Admin. Code §§ 8-102.

**FACTS COMMON TO ALL COUNTS**

9. Plaintiff began her employment with Defendant on or around April 30, 2018.

10. Ms. Gorin worked for Defendant until her constructive discharge on October 27, 2023.

11. During her nearly six (6) year tenure, she worked for Defendant University as Assistant Vice President, Institutional Advancement.

12. Ms. Gorin worked tirelessly for Defendant University and was a very successful employee. She never once received a verbal or written warning.

13. Plaintiff's accomplishments for Defendant University include, but are not limited to: recruited individuals to the Board of Governors and secured donations; created and managed the Graduate School of Business real estate advisor board and secured significant donations for the program; was an integral part of the fundraising and alumni relations team at New York Medical College; secured significant donations for Defendant University from both past and new donors; ran a successful fundraising event for the Touro College of Osteopathic Medicine that honored Mayor Eric Adams; ran successful gala and golf outings for the Touro College of Dental Medicine; managed and recruited the Board members to the Dental School Board and secured several five (5) and six (6) figure gifts for the school; and managed the day-to-day operations of the Institutional Advancement department.

14. Unfortunately, Ms. Gorin's former direct supervisor, Paul Glasser ("Glasser"), Vice President Institutional Advancement at Defendant University, engaged in pervasive acts of sexual harassment, gender discrimination, and retaliation against Ms. Gorin.

15. Mr. Glasser also engaged in acts numerous acts of gender discrimination against other female employees.

16. Upon information and belief, other female employees have filed complaints against Mr. Glasser concerning his discriminatory conduct.

17. Having suffered Mr. Glasser's conduct for years, and despite her fears, Ms. Gorin decided she could no longer endure Mr. Glasser's discriminatory, harassing conduct and decided to file a complaint with Defendant's compliance department in December 2022.

18. Plaintiff's complaint alleged, among other things, that Mr. Glasser engaged in gender discrimination and had created a hostile work environment.

19. As detailed in Plaintiff's December 2022 complaint, Mr. Glasser ran his department like an overbearing, belligerent dictator. This behavior was directed solely toward the female employees.

20. Some examples of this conduct that were outlined in the December 2022 complaint include, but are not limited to:

    a. Mr. Glasser would scream at Plaintiff as well as other female employees at the office;

    b. Mr. Glasser informed Plaintiff he could "speak to her how he wants" and that he was "tired of [her] telling him not to scream at [her];"

    c. During a phone call on September 8, 2022, Mr. Glasser was again screaming at Ms. Gorin. When she requested that he stop yelling, he responded by stating that the more she asks him to stop yelling at her "the madder [he] get[s]." Following this call, Jay Strong, who had overheard the entire conversation, stated that he did not feel comfortable working under those type of conditions;

    d. Mr. Glasser would dismiss the accomplishments of Plaintiff as well as the other female employees;

    e. Mr. Glasser would request that Plaintiff and other female employees handle administrative tasks that were outside of the scope of their employment and become belligerent if they were unable to successfully perform said tasks. He would also ask women to assist with various events, even if they were paying attendees, but did not ask the same assistance of men;

    f. Mr. Glasser disparagingly spoke about Plaintiff to other employees, including calling her "incompetent";

    g. Mr. Glasser would inform Plaintiff that other individuals, such as Rabbi Moshe Krupka, M.S. ("Rabbi Krupka") and Alan Kadish, M.D. ("Dr. Kadish"), Defendant's President, do not value or appreciate Plaintiff;

    h. Mr. Glasser would use gender discriminatory phrases such as telling employees to put on their "big boy pants" and that he would speak to "the boys;" and

    i. Mr. Glasser publicly screamed at Ms. Gorin prior to the 2022 50th Anniversary Gala, embarrassing Ms. Gorin and shocking the numerous witnesses that could not help but witness his despicable conduct;

21. The December 2022 complaint also noted that Plaintiff had requested assistance, on numerous occasions, from Rabbi Krupka concerning Mr. Glasser's hostile, discriminatory, and harassing conduct. Rabbi Krupka acknowledged that Ms. Gorin's working environment was problematic and informed her that he was "working on it." He also noted in April 2022 that he was aware that Plaintiff did not want to report to Mr. Glasser and requested that she give him until October 2022 to handle the situation. Despite his assurances, nothing ever changed or improved.

22. In comparison, male colleagues were treated respectfully by Mr. Glasser and were not screamed at or mistreated.

23. It took Defendant University nearly three (3) months, until March 16, 2023, to conclude its investigation into the December 2022 complaint.

24. Upon information and belief, Mr. Glasser did not receive any disciplinary action, and nothing was done by Defendant University to alleviate or remedy Ms. Gorin's intolerable employment environment.

25. At that time, Defendant informed Ms. Gorin that there was no violation under Defendant University's policies although Defendant acknowledged "the information gathered does demonstrate that the respondent's behavior lacked collegiality, thoughtfulness, and comportment[.]"

26. Unfortunately, Defendant University's failure to act only led to Mr. Glasser doubling down on his behavior by retaliating against Ms. Gorin for her complaint and making her work environment more hostile.

27. Mr. Glasser's retaliatory acts included excluding Ms. Gorin from necessary correspondence and meetings and taking away her job duties, without discussion or explanation.

28. In or around August 2023, Ms. Gorin informed Defendant University of Mr. Glasser's continuous bad acts and retaliatory actions.

29. As Ms. Gorin informed Defendant University, Mr. Glasser continued to diminish her contributions, sabotaged her work efforts, spoke disparagingly about her, and informed several of her colleagues not to interact or speak with her.

30. Plaintiff's complaint concerning the continued gender discrimination, hostile work environment, and retaliation contained fourteen (14) bullet points and was emailed to Richard D. Grimes ("Grimes"), Compliance/Human Resources, on August 8, 2023.  As noted to Mr. Grimes, the complaint only contained *some* examples of the discrimination, hostile work environment, and retaliation that Ms. Gorin was forced to endure.  The examples identified were as follows:

   a. Prior to her departure from Defendant University, Melissa Marks-Shih ("Marks-Shih") and Ms. Gorin had been speaking with Ronnie Myers, D.D.S. ("Dean Myers") about reconfiguring the Board. They had numerous meetings and conversations about this and came up with a list of targets. Ms. Gorin had briefed Mr. Glasser fully on this. Mr. Glasser does not have much contact with members of the Board; Ms. Marks-Shih and Ms. Gorin were the primary points of contact. However, following her initial discrimination complaint, Mr. Glasser excluded Plaintiff from the process entirely;

   b. Gissal Dobles Hartnett ("Dobles Hartnett") and Ms. Gorin were responsible for database management. Ms. Dobles Hartnett and Ms. Gorin would have weekly meetings with the Raiser's Edge consultant, Maggie Steele-Tzakos ("Steele-Tzakos"). Following Plaintiff's complaint, Mr. Glasser excluded both Ms. Gorin and Ms. Dobles Hartnett from any conversations about the database;

   c. On January 24, 2023, Ms. Gorin spoke to Mr. Glasser about a work issue. His response was extremely nasty and hostile and asked why people were calling her instead of him.  One of Ms. Gorin's colleagues overheard the exchange and was so shocked by his tone that she emailed Ms. Gorin to ask what it was about;

   d. On February 8, 2023, Ms. Gorin was voluntarily working on the Touro College of Dental Medicine ("TCDM") gala as Defendant University lacked a full-time Events Director. Ms. Gorin called Mr. Glasser about several issues regarding using a consultant.  Mr. Glasser told Ms. Gorin he wished she would "stop calling him;"

e. On February 13, 2023, Ms. Gorin took a day off from work and Mr. Glasser nastily accused her of calling a donor. In reality, Ms. Gorin returned a donor's call as it was her job to respond to a potential donor. Rather than being pleased with her dedication to her job, Mr. Glasser was so inexplicably angered by this that he put his complaint in an email;

f. Before the TCDM gala, Ms. Gorin made Mr. Glasser aware of some concerns about seating and registration, and he dismissed them out of hand. This led to scenarios at the event that compromised the integrity of TCDM and which could have been avoided;

g. In March 2023, Mr. Glasser left Ms. Gorin off key correspondence on the TCDM Golf Tournament, an event Ms. Gorin was managing. Instead of working with Dean Myers and Ms. Gorin to make the event successful, Mr. Glasser sent an email about not calling certain individuals, which upset Dean Myers. When Mr. Glasser and Ms. Gorin did interact, Mr. Glasser was hostile and combative. To Ms. Gorin's face, he would occasionally tell Ms. Gorin that she was doing a great job. However, he would send emails and spoke with the Deans and her colleagues behind her back, bad-mouthing her work performance. He also diminished Plaintiff's hard work. Mr. Glasser would go out of his way to ask other people for information about the event to avoid asking Ms. Gorin;

h. Mr. Glasser referred to Eileen Goltz, a woman who worked with them as an event coordinator, as a "glorified telemarketer;"

i. On April 5, 2023, Ms. Gorin received a phone call from Mindy Berman ("Berman") telling her that she was excited that she was going to be working with Defendant. Ms. Gorin called her back, and Ms. Berman told her that during the interview process, Mr. Glasser told her not to speak to Ms. Gorin and said his relationship with Ms. Gorin had tension. Ms. Berman also informed Ms. Gorin that Mr. Glasser questioned whether Ms. Gorin would come into the office. Ms. Gorin worked a hybrid schedule, which Mr. Glasser was aware;

j. On May 29, 2023, Ms. Gorin found out that there was going to be Board of Governors committee meeting. Ms. Gorin usually attended those that pertain to development as Ms. Gorin worked on both donor agreements, giving history with the Board and stewarded them. However, Ms. Gorin was informed that she was not to be included. Mr. Glasser chairs this committee. Ms. Gorin was eventually sent the invite for the meeting on June 6, 2023, at 8 PM from a Board Member. Ms. Gorin later learned from a member of the Board that the meeting was changed. Mr. Glasser never informed her about the change in the meeting;

    k.    On June 16, 2023, Mr. Glasser, Ms. Berman, and Ms. Gorin had a meeting with a vendor. After the meeting, Ms. Berman, Mr. Glasser, and Ms. Gorin stayed on the zoom. Since the meeting ran late and Ms. Gorin had another Zoom to get on with a prospective donor, Ms. Gorin asked if they could continue the conversation another time. Mr. Glasser nastily stated that Ms. Gorin was "impossible;"

    l.    Mr. Glasser had been telling the consultant, Ms. Steele-Tzakos, that the department was being reorganized. While Ms. Gorin did not know exactly what this meant, based on the uptick in his hostile behavior, it made her fearful that this would affect her job and was an act of retaliation for her initial complaint. This fear was further amplified when a new organization chart did not have her position or name on the chart, while other employees were specifically identified;

    m.    Instead of walking by Ms. Gorin's office, calling her, or emailing her, Mr. Glasser would ask other colleagues if Ms. Gorin was in the office that day. This passive-aggressive behavior was damaging to her reputation as it showed that Mr. Glasser was avoiding interacting with Ms. Gorin. Moreover, it also implied that Ms. Gorin did not do her job and/or come into the office; and

    n.    On August 8, 2023, Ms. Gorin went to Mr. Glasser's office to make him aware that she had obtained a signed donor agreement for $50,000. Mr. Glasser barely acknowledged her, and his tone was dismissive. He did not acknowledge Ms. Gorin's hard work or the fact that Defendant had just obtained a new $50,000 donor. Mr. Glasser made it seem as though Ms. Gorin was not worthy of his time and dismissed her.

31. Yet again, Touro's investigation process into Ms. Gorin's complaint seemed to demand much of Ms. Gorin in the way of participation and providing information but resulted, yet again, in no action on the part of Defendant University.

32. Furthermore, the retaliation against Ms. Gorin only continued.

33. During the investigation into her August 2023 complaint, Ms. Gorin documented to Touro's compliance/HR department that Mr. Glasser had previously engaged in numerous egregious acts of sexual harassment against her from 2018-2019.

34. These acts include, but are not limited to, multiple occurrences of unwanted kissing and unwanted hugging and suggestive/inappropriate remarks. During each incident, Ms. Gorin expressed that these acts were unwanted, inappropriate, and should not occur again[1].

35. Ms. Gorin did not report these incidents initially as Ms. Gorin was understandably fearful of retaliation and losing her job. While Mr. Glasser did not engage in any additional acts of physical sexual harassment following November 2019, he continued to express his contempt and disdain for women in the workplace.

36. Although he did not engage in physical acts of sexual harassment, Mr. Glasser did engage in verbal sexual harassment following November 2019. These include, but are not limited to: informing Ms. Gorin that he "loved" her on a number of occasions, sending her a text that referred to "nipple tweaking"[2], and sending her gifts such as flowers and cards with inappropriate messages.

37. Upon information and belief, despite the complaints of multiple women, Mr. Glasser has astoundingly not received any disciplinary action to date.

38. Defendant University's failure to support and ensure that its female employees work in an environment free of discrimination and retaliation is not just reprehensible, it is illegal.

39. Mr. Glasser's persistent, discriminatory, and retaliatory actions toward Ms. Gorin, coupled with Defendant University's complete inaction (as well as the complaints of other female employees), has devastated Ms. Gorin emotionally.

---

[1] Defendant University informed Ms. Gorin that they were not intending to investigate these non-consensual, traumatic, illegal acts as they occurred more than two (2) years ago. Clearly Defendant's only concern was its own liability and not ensuring that the workplace was safe for its female employees.

[2] Mr. Glasser allegedly meant to send the text to someone else but had "accidentally" sent it to Ms. Gorin.

40. Ms. Gorin has been suffering from extreme anxiety, stress, health issues, and depression as a direct result of the discrimination and retaliation she had to endure as well as Defendant University's inaction.

41. Given the foregoing, Ms. Gorin was left with no alternative recourse, resulting in the constructive discharge of her employment with Defendant University in October 2023.

42. Unfortunately, Plaintiff's constructive discharge did nothing to stop Mr. Glasser from engaging in post-employment retaliation.

43. Since Ms. Gorin's departure from Defendant University, Mr. Glasser has been engaging in behavior toward Ms. Gorin that constitutes defamation and harassment. Mr. Glasser has been speaking to numerous colleagues and making libelous statements concerning Plaintiff.

44. The aforementioned facts clearly establish a pattern of sexual harassment, gender discrimination, and retaliation in violation of the New York City Human Rights Law and New York Human Rights Law.

45. Plaintiff's gender was a motivating factor in the treatment of Plaintiff by Defendant.

46. The working conditions for Plaintiff were so hostile and intolerable, with her numerous complaints being all but ignored, that she had no recourse but to be constructively discharged.

47. Defendant's treatment as outlined herein and otherwise toward Plaintiff, which resulted in her constructive discharge, was in retaliation to Plaintiff's opposition to conduct that Plaintiff reasonably viewed as discriminatory.

## COUNT ONE
### Gender Discrimination in Violation of New York State Human Rights Law

48. Plaintiff repeats a re-alleges the allegations set forth above as if fully set forth herein.

49. Plaintiff is a woman.

50. Defendant discriminated against Plaintiff on account of her gender, by and among other things, treating her disrespectfully, rudely, hostilely, and differently than male co-workers, and by generally creating a hostile work environment, despite Plaintiff's exceptional job performance.

51. The actions of Defendant were taken in violation of the New York State Human Rights Law and have caused Plaintiff to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

52. Plaintiff has suffered, is now suffering and will continue to suffer economic injury, monetary damages, compensatory damages, and mental anguish and humiliation as a result of Defendant's discriminatory practices.

**WHEREFORE**, Plaintiff demands judgment against Defendants, for the following relief:

a. Economic Damages;
b. Compensatory Damages;
c. Punitive Damages;
d. Attorneys' fees and costs of suit;
e. Such other and further relief that the Court deems equitable and just.

## COUNT TWO
### Retaliation in Violation of New York State Human Rights Law

53. Plaintiff repeats a re-alleges the allegations set forth above as if fully set forth herein.

54. Plaintiff complained of and objected to employment practices that she believed were discriminatory on the basis of her gender.

55. Plaintiff faced retaliation for questioning and opposing the discriminatory practices.

56. The circumstances surrounding Plaintiff's constructive discharge suggest it was in retaliation to Plaintiff opposing the conduct that she reasonably viewed as discriminatory.

57. Despite Plaintiff's numerous complaints, Defendant failed to address or remediate the discrimination and retaliation that Plaintiff was forced to endure.

58. Said conduct is in violation of the New York State Human Rights, and caused Plaintiff to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

59. Plaintiff has suffered, is now suffering, and will continue to suffer economic injury, monetary damages, compensatory damages, and mental anguish and humiliation as a result of Defendant's unlawful practices.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

a. Economic Damages;
b. Compensatory Damages;
c. Punitive Damages;
d. Attorneys' fees and costs of suit;
e. Such other relief that the Court deems equitable and just.

## COUNT THREE
**Gender Discrimination in Violation of New York City Human Rights Law**

60. Plaintiff repeats a re-alleges the allegations set forth above as if fully set forth herein.

61. Plaintiff is a woman.

62. Defendant discriminated against Plaintiff on account of her gender, by and among other things, treating her disrespectfully, rudely, hostilely, and differently than male co-workers, and by generally creating a hostile work environment, despite Plaintiff's exceptional job performance.

63. The actions of Defendant were taken in violation of the New York City Human Rights Law and have caused Plaintiff to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

64. Plaintiff has suffered, is now suffering and will continue to suffer economic injury, monetary damages, compensatory damages, and mental anguish and humiliation as a result of Defendant's discriminatory practices.

**WHEREFORE**, Plaintiff demands judgment against Defendants, for the following relief:

f. Economic Damages;
g. Compensatory Damages;
h. Punitive Damages;
i. Attorneys' fees and costs of suit;
j. Such other and further relief that the Court deems equitable and just.

## COUNT FOUR
### Disparate Treatment and Retaliation- Violation of New York City Human Rights Law

65. Plaintiff repeats a re-alleges the allegations set forth above as if fully set forth herein.

66. Plaintiff complained of and objected to employment practices that she believed were discriminatory on the basis of her gender.

67. Plaintiff faced retaliation for questioning and opposing the discriminatory practices.

68. The circumstances surrounding Plaintiff's constructive discharge suggest it was in retaliation to Plaintiff opposing the conduct that she reasonable viewed as discriminatory.

69. Despite Plaintiff's numerous complaints, Defendant failed to address or remediate the discrimination and retaliation that Plaintiff was forced to endure.

70. Said conduct is in violation of the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.*, and caused Plaintiff to suffer economic, emotional, and psychological damages in an amount to be determined by a jury.

71. Plaintiff has suffered, is now suffering, and will continue to suffer economic injury, monetary damages, compensatory damages, and mental anguish and humiliation as a result of Defendant's unlawful practices.

**WHEREFORE**, Plaintiff demands judgment against Defendant as follows:

f. Economic Damages;
g. Compensatory Damages;
h. Punitive Damages;
i. Attorneys' fees and costs of suit;
j. Such other relief that the Court deems equitable and just.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury as to all issues, causes of action and claims.

## DESIGNATION OF TRIAL COUNSEL

Carly Skarbnik Meredith, Esq. is designated as trial counsel in this matter.

## DEMAND FOR PRODUCTION OF INSURANCE AGREEMENTS

Demand is hereby made that you disclose to the undersigned whether there are any insurance agreements or policies under which any person or firm carrying on an insurance business may be liable to satisfy all or part of a judgment which may be entered in the action or to indemnify or reimburse for payment made to satisfy the judgment. If so, please attach a copy of each, or alternatively state under oath and certification: (a) policy number; (b) name and address of insurer; (c) inception and expiration date; (d) names and addresses of all persons insured thereunder; (e) personal injury limits; (f) property damages limits; and (g) medical payment limits.

## NOTICE OF PRESERVATION OF ELECTRONICALLY STORED INFORMATION

Defendant is hereby put on notice that any and all electronically stored information and databases, servers, back up servers, are to be maintained so that any electronic evidence is preserved for this litigation.

**DEUTSCH ATKINS & KLEINFELDT, P.C.**
*Attorneys for Plaintiff, Beth R. Gorin*

By: ___*Carly Meredith*___
    **CARLY SKARBNIK MEREDITH, ESQ.**

Dated: April 8, 2024